Good morning, Your Honors. Nathan Matthews on behalf of petitioners. I'll try not to repeat the background of this case that was covered in the prior argument, but I'd like to reiterate that the Mountain Valley Pipeline will be the largest pipeline of its kind to cross Virginia and the Jefferson National Forest in particular. And which isn't to say that there is not experience with other pipelines in the Jefferson National Forest, but even when smaller pipelines have been constructed, as we discussed in the briefs, they have led to significant impacts on erosion and to the forest as a whole. Today I'd like to focus on two impacts in particular, impacts to interior forests and impacts on sedimentation. I'll begin with interior forest. The value of an acre of habitat depends in part on its surroundings. Birds and animal species within Jefferson National Forest, or some species within the Jefferson National Forest, are vulnerable at forest edges or out in the open, and these species do best when provided with thousands of acres of contiguous, deep, dark forest habitat. The Jefferson National Forest Plan, the Forest Service's 2012 planning rule, and the environmental impact statement in this case all recognize the importance of providing this type of interior forest habitat in the Jefferson National Forest. And that interior habitat will be impacted by the pipeline in a number of ways. Most obviously, cutting trees in the pipeline right away will impact that habitat, but the record also clearly establishes the mechanisms for two additional kinds of impacts. First, the creation of edge effects where the forest on either side of the pipeline will have additional light and wind, changing the plant communities in that forest. The clearing will also provide a pathway for additional predators to come in and access species that were previously protected in the adjacent forest along the right-of-way. So all the parties here agree that the pipeline, the edge forest along the pipeline route no longer provides interior forest habitat, and the pipeline will convert the forest on either side from interior to edge. Despite recognizing that mechanism, the environmental impact statement here provides no analysis whatsoever of the extent to which that impact could be reduced by co-locating the pipeline with existing disturbance. So basically putting it where there already was forest edge. We contend that this omission is significant because the Jefferson National Forest Plan, the EIS itself, recognizes the importance of interior forest as one of the three key environmental impacts of the pipeline. And impacts on edge effects in particular are identified as the largest impact in terms of acreage on interior forest in the EIS. And so for the EIS to say that impacts on interior forest are one of the most important factors for the EIS to recognize that 22,000 acres of new edge are going to be created by the pipeline, many times the amount of acreage directly impacted, but then to provide no analysis of the extent to which that key impact could have been reduced by co-locating with existing disturbance means that the EIS failed to take a hard look at the impacts of the pipeline and at available alternatives. Moving beyond the forest edge, the EIS also recognizes that because the clearing for the right-of-way and the newly created forest edge on either side of the pipeline are not interior forest, that these regions can act as a barrier to migration of forest interior species and so can fragment previously contiguous forest habitat. Again, although the EIS recognizes the nature of that impact, it provides no discussion for either the approved route or for any alternative routes as to what those impacts would actually be. How big of a reduction in high-quality interior forest habitat are you going to see because of this pipeline? And again, to recognize that an effect is important and that one of the functions of the Jefferson National Forest is to provide this kind of large block of habitat and then to say nothing about the actual effects of the project at issue here on that resource falls short of the hard look that NEPA requires. The failure to take a hard look at the importance of interior forest is further demonstrated by the presumptions in the Mineral Leasing Act and in the Forest Plan to co-locate with existing disturbance where co-location avoids those impacts on surrounding forests. Here we argue that the Bureau of Land Management violated both the Forest Plan, provisions of the Forest Plan that are not amended here, and the Mineral Leasing Act by entirely ignoring the command to co-locate where practical and that the record does not demonstrate that co-location would be impractical here. The Environmental Impact Statement affirmatively concludes that the four particular alternative routes that we discussed on our reefs were technically feasible. It also indicates that those routes were not economically impractical. It dismissed other alternatives on grounds of economic impracticality but said nothing at all about economic impracticality for the routes at issue here. And although in the briefs BLM identifies statements made about one particular alternative as presenting a few additional difficulties, nowhere in the record did BLM contend that those difficulties rose to the level of impracticality, and it's not clear how BLM could have reached that decision given that the increases appeared de minimis relative to the overall impacts of the pipeline, that where a pipeline is already going to cross 120 miles of steep slope, it's not clear why that is practical but crossing an extra couple of miles tips the scale towards impracticality. So on this issue where we have no analysis from the agencies, there's nothing to defer to, and so this Court should remand for further consideration of impacts to interior forests and for consideration of whether the colocation of the existing disturbance would be practical and therefore required under the Mineral Leasing Act and feasible and therefore subject to a preference under the existing standards under the Jefferson National Forest Plan. Turning from interior forest impacts to sedimentation, I'll just focus on one of our sedimentation arguments today, which is the effectiveness of mitigation measures that would be used to reduce the amount of mitigation or the amount of sedimentation. Here, the Forest Service's decision was arbitrary because it relied on a number that, by the Forest Service's own admission, was wrong. The Forest Service submitted comments on the sedimentation analysis criticizing the estimate of how well mitigation would work. The Forest Service said that may be what you can determine in a test with ideal circumstances, but in practice we have seen that implementation is imperfect and that imperfect implementation really matters. The Forest Service recommended a much lower range of effectiveness that would result in many more times the amount of sediment being assumed to reach waterways. The Forest Service based that criticism of the assumed mitigation effectiveness on the Forest Service's experience with another much smaller pipeline project in the same portion of the Jefferson National Forest, the Columbia-Gas-Virginia expansion, that suffered what Forest Service employees termed a catastrophic failure resulting in the release of sediment just a few years ago. So the Forest Service, when bringing its own expertise to bear, concluded that it was essential that the analysis of aquatic impacts and of impacts to soils consider the role of imperfect implementation in practice. There's no explanation in the record for the implicit about-face where this analysis that the Forest Service had criticized as wrong was then incorporated into the final environmental impact statement. The agency's failure to explain that difference and the environmental impact statement's failure to consider the role of imperfect implementation, which I should stress petitioners also identified in their prior comments even before there was a sedimentation analysis, we said when considering sedimentation you will have to consider imperfect implementation in practice. Failure to consider issue at all rendered the Forest Service's conclusions regarding sediment arbitrary. I'll note that respondents argue that additional materials submitted by the applicant two days before the Forest Service record of decision and final environmental impact statement were published. Respondents argue that those materials somehow rehabilitated this flawed estimate of mitigation effectiveness. There's no indication in the record that the agency's actually considered those late-filed materials. And those, insofar as the court does consider those materials, there's nothing in there that fundamentally changes the argument. There's no analysis in those extra materials about effectiveness in practice. It's just some additional data regarding arguments that had already been made and found wanting by the Forest Service. In the time I have remaining, I'll switch to the arguments about the Forest Service's compliance with the 2012 Forest Planning Rule. The planning rule requires consideration of whether amendments to a forest plan are directly related to substantive requirements of that planning rule. And direct relation is not just a question of whether there's going to be an adverse effect on resources, but also just whether the purpose of the amendment relates to the purpose of the protective provision. Here, the Forest Service entirely ignored purpose in its assessment of whether or not these amendments were directly related. And there is no basis for concluding that an amendment to soil and riparian standards does not have a purpose that overlaps with the purpose of the planning rule provisions regarding soils and aquatic resources. The Forest Service's interpretation is contrary to the plain language of the statute, and where language is plain, the agency receives no further deference to a contrary interpretation of its own regulation. And insofar as the language is not itself plain, the Forest Service already interpreted that language in the preamble to the 2016 amendments to the planning rule where it provided numerous examples of what would constitute a direct relationship. And that interpretation offered contemporaneous with the rule after notice and comment is the interpretation that should control. There's no ground for the Forest Service to retreat from that interpretation purely in a litigation posture later on. The Forest Service argues that any failure to comply with the planning rule was a harmless error because it contends that there is no adverse effect on sedimentation. We in the first place argue that that is incorrect because the record demonstrates that there will be an adverse effect on sedimentation, or at least the Forest Service's sedimentation analysis is arbitrary. But the planning rule is not just about preventing adverse effects, it is also about considering whether restoration or improvement is required, and if so, providing additional measures to ensure that that restoration is obtained. And here there is no analysis anywhere in the record of whether soils and aquatic habitat in the region of the Mountain Valley Pipeline in the Jefferson National Forest are degraded in a way that warrants restoration, nor is there any discussion of whether the Mountain Valley Pipeline would be consistent with or would preclude future restoration if that's necessary. I guess I'll lastly touch on the argument about remedy in this case. The Natural Gas Act provision cited by interveners does not explicitly preclude this Court's authority to vacate the BLM and Forest Service decisions here. Nothing in that provision says in the first sentence of sub D3 of 7-1-7-R prohibits or interferes with the Court's inherent ability to order vacature. I also explained in the briefs that sentence doesn't apply here where the agencies authorized rather than prohibited a gas pipeline. Thank you, Mr. Matthews. Mr. McArdle. Good morning. Kevin McArdle for the Federal Respondents, and may it please the Court. I'll start first with the question of interior forest impacts. The main statute at issue for that claim is the National Environmental Policy Act, NEPA. So the question the Court's faced with is what did the agency have to do to comply with NEPA and the deferential arbitrary and capricious standard of review with respect to interior forest impacts? What they had to do was disclose sufficient information about the impacts of their specific actions to allow for informed decision making. That's it. And there's no question that the agencies did that in this case. It's important to keep in mind the scale of the action that's at issue. Mr. Matthews began by talking about the Mountain Valley Pipeline as a whole, but this case isn't about the Mountain Valley Pipeline as a whole. FERC, as you've heard earlier today, authorized the Mountain Valley Pipeline. Its decision is being challenged in the D.C. Circuit, including under NEPA. The actions at issue here represent an important but small part of the whole pipeline. BLM, under the Mineral Releasing Act, was charged with deciding whether to grant a 3.6-mile right-of-way for the pipeline over the Jefferson National Forest. The Forest Service was charged with deciding under the National Forest Management Act whether to amend its plan to accommodate the right-of-way, accommodate the pipeline. And the right-of-way itself requires clearing a total of 83 acres of forest within the 723,000-acre Jefferson National Forest. That's one one-hundredth of one percent. Fifty acres are for clearing the pipeline, and 30 acres are for expanding existing roads. There's no new roads, no above-ground facilities. The pipeline, after it's installed and buried, the construction corridor will be rehabilitated, and most of the corridor will regenerate to forest over time. So under NEPA, the agencies had to disclose sufficient information to allow for informed decision-making about the consequences of clearing one one-hundredth of a percent of the national forest. And they met that standard easily. The EIS disclosed that the right-of-way would transect three core forest areas in Virginia. And what will happen as a result? The EIS addresses that as well. It says interior blocks of forest will be fragmented, and that 300 feet on each side of the corridor will be converted to edge habitat. The EIS goes a step further and addresses, what are the environmental consequences of that fragmentation and conversion to edge? And it explains the consequences for vegetation and for wildlife. It explains, for example, that some species may benefit by having movement corridors in the forest, while other species may be harmed because they depend on large blocks of contiguous forest habitat. And the interesting thing to note is that petitioners in their briefs, they never identify a specific environmental consequence of fragmentation and edge effects on wildlife or vegetation that the agencies fail to consider. In fact, their brief cites primarily to the EIS to explain what happens as a result of fragmentation and conversion to edge, demonstrating that the agencies appropriately considered the issue. The one argument they try to hang their hat on is that there was insufficient quantitative data about edge effects and forest fragmentation. But the EIS addressed that as well. For the right-of-way at issue in this case, the EIS explained that 83 acres within the Jefferson National Forest would be cleared, and it would result in a conversion of 336 acres of adjacent interior forest habitat to edge. The EIS also incorporated by reference Mountain Valley Pipeline's Migratory Bird Conservation Plan, not as a substitute for an analysis that allegedly was missing from the EIS, but as a supplement to that analysis. The Migratory Bird Conservation Plan provides quantitative data that shows that even after construction, the three core areas transected by the right-of-way will still provide large quantities of continuous habitat that would serve even the most sensitive interior forest wildlife. So with or without the Migratory Bird Conservation Plan, the EIS provided sufficient information for the Forest Service and the public to understand the consequences on interior forests of clearing one one-hundredth of a percent of the whole forest area. The other aspect of interior forests that the plaintiffs challenged is the alternatives analysis, where petitioners claim that the EIS provided no information. But that's just not true. The EIS provided at least two important points of comparison. They explained that the alternative national forest crossings that were evaluated would cross the forest or a portion of it along existing rights-of-way. They explained what that meant for interior forests. It means you have to expand the existing corridor and shift the existing forest edge to facilitate the installation of the pipeline, but you avoid converting new, you avoid new fragmentation and the creation of new edge. That's a common sense principle. It was clearly explained in the EIS, and it allows for a meaningful comparison of alternatives, which is all that NEPA requires. As to the alternatives more broadly, the EIS provided the amount of interior forest acreage that would be crossed for nearly all the alternatives. I say nearly because, for one, it didn't provide that figure, hybrid 1A, but that alternative was simply a combination of the proposed action and alternative one. And so the reader could understand, the reader of the EIS, that hybrid 1A provided, impacted less interior forests than alternative one, which maximized co-location, but, I'm sorry, more than alternative one and less than the proposed action. Now the petitioners will come back and say, but that just addresses direct effects on interior forests. But elsewhere, the EIS explained that indirect effects are proportional to the direct effects. For instance, I mentioned earlier that when you build a corridor through interior forest, not only will you be clearing the forest for the corridor, but you'll be converting 300 feet on either side to edge. So the agency decision makers and the public could understand from the figure in the EIS about the total interior forest acreage cross, you know, what the overall impacts would be, and that the indirect effects on interior forests would be proportional to the direct effects. So that facilitates a meaningful comparison and informed decision making, which is all that NEPA requires. Does it require explaining why it was rejected? It requires. What you're saying is just saying, well, we know there are alternatives. That's it? Well, no. The agencies addressed that. That was, yes, moving on. The agencies next addressed. Oh, I was about to say. They did a comparison of alternatives and concluded that none of the alternative routes provided a significant environmental advantage over the proposed route. And they explained their reasoning for doing that. The petitioners say that, and by the way, the petitioners suggest that the agencies ignored the presumption in the Mineral Leasing Act that co-location reduces impacts, including impacts on forests. But that's not correct. The agencies recognized that presumption right up front at the beginning of their analysis. And they also recognized that impacts on interior forests were a key criteria in the comparison that Your Honor just mentioned, the comparison of alternatives. But there were other key considerations, one of which was the amount of slope terrain that would be crossed. The agencies explained, look, when you're crossing slope terrain, you're creating difficulties, obstacles to safe construction, and you're increasing the risk of erosion and debris flows. So for those reasons, we're going to give the construction along sloped areas equal consideration to forest impacts. And then they went through all the pros and cons of the different alternatives and ultimately exercised the judgment that none provided a significant environmental advantage. And, you know, the plaintiffs want the court to second guess, the petitioners want the court to second guess that judgment, but it's a judgment that belongs to the agencies to make. And it can't be reduced to some sort of mathematical comparison. You know, you can't reduce impacts on landowners, impacts on forests, impacts on sloped areas. Speaking of math, can you explain to me the evolution of your client's views of the hydrologic report, the 79 percent that it criticized but then it's apparently fine with now? Right. I think the basic flaw in the plaintiff's argument on that is that it's based entirely on the Forest Service's initial comments on the draft hydrological analysis but ignores MVP's response to those comments. So the Forest Service submitted a comment suggesting that 79, the estimate in question is that MVP's mitigation measures, their erosion control measures would be 79 percent effective at containing soils. And the Forest Service suggested that that seems a little optimistic and it's based on laboratory tests. You know, you should take more of a worst case approach rather than a best case, which is what you appear to be taking. And they also raised a concern about implementation. They said the success of mitigation measures depends on the proper implementation. You need to address that. So MVP responded. They sent a letter to the Forest Service with a revised analysis, additional information, and they said 79 percent that we're using is not a best case scenario. It represents the median, the average of a range of tests documented in a study. The relevant study is not, strictly speaking, a laboratory study. It's a field scale study designed to simulate real world conditions. And they reminded the Forest Service that the project is subject to strict monitoring by both federal and state agencies, which would ensure successful implementation of the control measures. And they also mentioned that the tests that they were relying on for the 79 percent figure focused exclusively on one sediment control measure at a time, whereas MVP would be implementing a suite of control measures. So there was a statement made that, well, that information was provided shortly before, two days before the Forest Service issued its decision. And that might not be a direct quote, but, in fact, it was provided months before the Forest Service made its decision. It was sent in June 2017 directly to the Forest Service, several months before the Forest Service made its final decision to adopt the EIS as its NEPA document. So the material is properly before the court, part of the administrative record on which the agency's decision is based, and shows that the Forest Service's ultimate conclusion to adopt the EIS, including the analysis of sedimentation, has a rational basis. Okay, I have another question then. Where in the record of decision is there where the Forest Service, I'm sorry, considered whether the purpose of the amendment was directly related to the planning rule requirements? Where can I find that in the record? Well, the Forest Service position is that the purpose element doesn't apply here. Because the purpose prong of the test for directly relatedness is implicated only when the Forest Service is changing plan direction for resource management. So, for instance, one of the standards that is at issue here required 85 percent of soils to be maintained over the project area. Now suppose, for example, that the Forest Service came in and said, we're going to change that management direction for soil resources. The purpose then of the amendment is to change management direction, so it implicates the substantive requirement for soils in the 2002 planning rule. I see I'm running out of time. Should I continue? Yeah, you may. Okay, thank you. But here, the Forest Service wasn't changing plan direction. Plan direction remained as it was. They were accepting one small project from existing plan direction. And so in that scenario, the Forest Service properly applied the effects test of the directly relatedness inquiry. And also I would add, this issue ultimately doesn't matter because even if the substantive requirements in the 2012 rule for soils and water resources did apply, the amendment complied with those requirements because all that they require is that the amendment include components to maintain or restore the resources, which these amendments did by incorporating the extensive mitigation. And so for all these reasons, the petition for review should be denied, unless the Court has further questions. I've got one. Go ahead, Judge Trax. I've got one. Going back to the Forestry Report, there were changes made. It took one position in June, different position in December in the reports. Can you explain why there was a change? Is Your Honor referring to the sedimentation? Referring to the Forest Service's June 5, 2017, Notice of Updated Information, and then their December report of decision. Do you understand my question? I think I did, where they initially indicated that they were going to have to, that some substantive There was an indication in June that the amendments were directly related to the regulation. Then in December they changed their mind and say, no, they're not. So what is the explanation? Well, that was a draft notice designed to solicit comments on the issue, and then the Forest Service completed its analysis and documented in the final decision why the amendments would not have a substantial adverse effect on or substantial lessening of protections for soil and water resources. So that explanation of why the amendments aren't directly related documents the reasons for the apparent change in position, although that was only a preliminary document, the one in June. The Forest Service relied on the hydrological study done by Mountain Valley, right? Correct. Mountain Valley developed in conjunction with the Forest Service and BLM. Right. But it's the Forest Service obligation to protect the citizens of the United States in terms of its forests and natural resources, correct? Correct. But, Your Honor, I would submit that this back-and-forth between the agencies and MVP documented in the record shows that the Forest Service just didn't blindly accept what MVP provided. They scrutinized the figures and only accepted the figures after MVP provided additional information. So that's exactly the type of back-and-forth that NEPA envisions and exactly the type of scrutiny that you'd expect to see from the agency here. Your test is what, a second draft, as opposed to the? The final EIS, which precedes the record of decision by several months. The EIS included an earlier draft of the hydrologic analysis, but it included the same two estimates. Was that a mistake? I think the Forest Service should have referenced the most up-to-date version, but the same estimates are in both versions. The 79 percent estimate that we've been discussing and the 10 percent aquatic impact threshold, which is the other one. Both of those were in the draft cited in the final EIS. The revised analysis simply provided additional information supporting those figures. I assume the Forest Service has been in the business of protecting forests longer than Mountain Valley, correct? That's correct. Where in the record does it show that you rigorously wrestle with the idea of 79 versus 48? That's what your record said. You said, wait a minute, we've been doing this for a long time, 48 is a more reasonable estimate. How did you capitulate to the 79? Well, because MVP provided additional explanation and additional material. That's amounted all of your experience as the Forest Service in terms of that? How can that be? Well, all the Forest Service experience is one of the reasons that the court should defer to the agency's judgment, which was based on the agency's judgment. But we're trying to see whose judgment are we deferring to, yours or Mountain Valley? Well, the Forest Service raised questions. MVP provided additional information, and then approximately four or five months later, the Forest Service made its final decision that the hydrologic analysis provides a real-world picture of what sedimentation is supposed to be like. And like I said, that process, that back and forth, shows that the Forest Service scrutinized MVP's numbers. It didn't just accept them. Great question. All right. Thank you so much. Thank you. Mr. Sibley? Good morning, and may it please the Court, Trey Sibley for the intervener, Mountain Valley Pipeline. I'd like to start by making just an observation about some law that governs the bulk of the claims. Each of the petitioner's claims here are governed by, not each of them, most of the claims, arise under the National Environmental Policy Act. And they concern the depth of the analysis about impacts, the environment, and the evaluation of alternatives. And this Court and the Supreme Court have enunciated a number of principles that we think are directly applicable to this Court's review. First, while the EIS, Environmental Impact Statement, must provide a thorough assessment of environmental impacts, the depth of the agency's analysis is ultimately governed by a rule of reason that gives the agency's substantial discretion to determine the usefulness of additional information. That's from the Supreme Court in the public citizen case. This Court has referred to the process as a delicate balancing act in its Webster decision. There's always the ability to provide an additional analysis, an additional calculation. Where to draw the line is ultimately a matter that's left to the agency's discretion. And that's not just this Court. That's the view of the D.C. Circuit and the Coalition on Sensible Transportation case. The second principle that is reflected in the case law, certainly in this Court's decision in Webster and in the Court's decision in American Whitewater, is that the Court's job in reviewing an environmental impact statement is not to flyspeck it. Instead, the Court is to take a holistic view of what the agency has done to assess environmental impact and examine the various components of the agency's environmental analysis to determine, on the whole, whether the agency has conducted the required hard look. And finally, the Court should be most deferential when evaluating matters that are within the agency's area of scientific and technical expertise. Now, with respect to the hydrologic analysis, which was the focus of questions to Mr. McArdle just now, it's quite clear that the Forest Service did take a look at the sedimentation effects. It did not accept blindly what my client had provided on that. It asked the hard questions. It demanded the difficult answers. I have a question. Your client met with the Forest Service about this report and said, quote, that they were, quote, concerned that lowering the containment value from 79 percent to 48 percent, as was recommended in the Forest Service comments on the sedimentation analysis, would have ramifications for the entire project analysis. What does MVP mean by that? Well, that argument, that's taken slightly, that's a portion of the entire meeting notes. We refer the Court to the whole notes in our discussion of those in our brief. They were discussing basically the competing view about the efficacy of sedimentation and some of the problems with accepting the lower figure as the correct one. What would the ramifications to the entire project be if they used the lower figure, which the Forest Service had recommended? Well, the Forest Service had evaluated using the lower figure, and I'm not sure that the record contains a discussion of what those ramifications would be. But fortunately, we don't need to reach that question because based on the information provided by Mountain Valley Pipeline, it was demonstrated that that lower figure was not the correct one, that instead the higher figure was instead a much more accurate depiction of real-world alternatives. And it should be noted that even after this discussion— So you don't know what your client meant when the representatives told the Forest Service that lowering the number would have ramifications for the entire project? I think what they meant was that the number is incorrect. And so then what would the ramifications be? Well, the ramifications, as they were explaining it, would be to challenge basic practice for dealing with construction-related impacts, very similar to the ones that we were discussing in the previous case with respect to Virginia. It's worth noting as well that as this process is unfolding with the Forest Service, as Mr. McArdle had noted, these very questions about the efficacy of sedimentation and erosion controls are going through analysis at the State level. And at the end of that process, as reflected in the record in that case, those measures that were imposed were better than best. They went beyond what had been done previously and addressed the very concerns here. With respect to sedimentation and the hydrologic analysis, what we don't have here is an about-face. We have instead an agency asking the hard question, getting the answer, and making a fully informed decision at the end of the process. So we're not in the territory where we're implicated by the FOX decision. It seems like a fair interpretation of the language used, a ramification would be that it would call into question your other numbers and estimates for the project broader than just this. If this number is from 79 to 48, the ramifications that make it call into question other aspects of it, broaden it in terms of the impact, correct? Wouldn't that be fair? That's a fair position, Chief Judge Gregory, but this is part of the robust back-and-forth where the agency is asking the hard questions. You're going to have an analysis here, and ultimately the agency reaches the decision. I'm missing the robust side of it. It's a one-way street. I mean, robust, it seems like. I don't see why the Forest Service is really robust at all. Well, Your Honor, I think it's reflected in their comments. I think they're commenting on the analysis. They're saying, whoa, this number seems way out of kilter to what we normally experience this, and then all of a sudden it says, oh, it's okay. I don't call that robust. I call that capitulation. Well, Your Honor, it certainly wasn't capitulation, and we would reject that as a fair characterization of what the Forest Service did here. They looked very closely at what the erosion and sedimentation controls are. They gave it the hard look. Wouldn't they want to go into what these ramifications are that you have so far, from Judge Thacker's question, have really not explained? Even you know what it is. Well, Your Honor, I think that you're asking there for the agency to do, one, that would be a challenge to the agency's methodology in evaluating environmental impacts, and this Court has noted that the agency enjoys discretion to pick the methodology that it would apply to evaluate those impacts. 48% was a reasonable estimate of effective, you know, mitigation. They concluded that it was not. They evaluated that. They received the additional information and realized that their original predilection was incorrect, and that's what agencies do when they're asking the challenging questions, and that's exactly what happened here, and that's exactly why the challenges under NEPA we don't think are meritorious because it's quite clear that both of the agencies that were involved here I don't want to belabor, but can you point to a record, Wendell J., where the Forest Service said that it was incorrect, that their figure was incorrect? Well, you certainly see the conclusion that they reach and the rationale for the conclusion. I know I see the conclusion because they attached the wrong draft to the thing. We know that, but you suggested that they said it was incorrect. I'm just asking you where in the record does it say that it was incorrect? It doesn't say in the record specifically that it's incorrect, but it's reflected in the conclusion, and the court can certainly discern the rationale based on what the Forest Service ultimately concludes, and it's both in the plan of development, which governs and imposes the Erosion and Sedimentation Controls that would apply within the forest, and with respect to the plan amendment itself, which documents their conclusion.  In terms of looking at these questions about whether or not the 2012 analysis, when you're doing amendments, whether they're directly related, and therefore the broader look at protection and sustainability, not just under the 1982 where it was just basically adverse impact. Is that a legal question that we just accepted by deference, or is that a legal question as to whether or not, in fact, the Forest Service was correct they're not directly related? Because that's what they concluded. Well, sure. I mean, it's a regulation, and it says it's the interpretation that a regulation would be a question of law. We submit that the Forest Service interpretation of that is correct here. But you agree we don't have to defer to that legal conclusion? I think you have to defer to the agency's interpretation of its own regulations under our. And that's what they've done here, and they provided that interpretation within the regulations itself. The Court should also read the regulations as a whole, specifically the provision that talks about purpose, and that's what really the petitioners here hang their hat on when it comes to the trigger for the Forest Planning Rule amendments, the 2012 rule. They focus on the purpose trigger, and their definition of purpose is way too broad, and you don't have to take my word for it. You can look at the regulations themselves. Section 219.13b1 talks about, for project-specific amendments like what we have here, how you go about identifying the purpose of the amendment. And as Mr. McCardle said, the purpose here was not to change plan direction with respect to soil and riparian standards. It was to grant what is effectively. The purpose doesn't matter, that it's the effects. So the purpose doesn't even matter. Well, it doesn't matter because the agency concluded that the purpose was to effectuate a project-specific plan amendment, which then kicks you over to an evaluation of whether there would be substantial adverse effects or a substantial lessening or lessening of protections. And in light of all of the mitigation measures that were in place by December when the plan of direction, a plan of development was issued and finalized and the plan amendment was issued, in light of all of those protections, they concluded there would not be a substantial adverse environmental effect or a lessening of protections. And therefore, the rule was not triggered. And let's not lose sight of the key point here with respect to the 2012 planning rule, and that is that even if it was triggered, all that rule requires is that there be planned components to protect soil and riparian interests. And there are still planned components to protect soil and riparian interests. The standards are still in place with respect to projects outside of Mountain Valley Pipeline. And with respect to Mountain Valley Pipeline itself, there are the mitigation measures that are reflected in the plan of development. I've gone way over my time. Are there further questions? No. Thank you so much, Mr. Sidley. Mr. Matthews, you have some time reserved. Thank you, Your Honors. Just to run through a few points, on the issue of sedimentation and mitigation control effectiveness, the record does reflect that there were meetings between representatives of Mountain Valley and the Forest Service prior to submission of the June 21st new materials, I believe. But as you alluded to, the minutes of those meetings reflect nothing but skepticism from the Forest Service employees and staff at every time about whether or not the higher number was, in fact, appropriate. There's no indication in those meeting minutes whether the ones we cited in our brief or the additional meeting minutes that can be found in the full record. There's no discussion of Forest Service staff ever agreeing to or explaining that they've had their minds changed. There is nothing in the record from the Forest Service discussing a reason for adopting a 79% figure rather than the 48% figure. And I'd like to clarify that in the comments the Forest Service submitted about the earlier draft of the hydrologic analysis, the Forest Service recommended 48% as an upper bound. The Forest Service was not saying that that was the most likely estimate of control efficacy, but that it was certainly no higher than and quite probably lower than 48% effectiveness. And adopting a lower number, that was their ceiling. Correct. That was their ceiling. And adopting a lower number does have broad ramifications for the other analyses in the record. We discussed some of those in our opening brief. The analysis of impacts to aquatic species is predicated on an estimate of how much additional sediment is going to be delivered to the waterways. And so if you reduce the estimate of mitigation effectiveness, resulting in, say, the analysis of whether or not the sediment load is going to impact those species is called into question. It has to be redone to see whether tripling the sediment load is going to impact those species. So there are many different parts of the analysis of environmental impacts of the project, both under NEPA and under other substantive limits, such as the Endangered Species Act, that are called into question and would need to be revisited if you got the sedimentation analysis, in our view, more correct. Turning to the extra material, I'd like to note that in addition to the fact that there's no evidence that the Forest Service ever actually relied on this material submitted on June 21st, that petitioners and other members of the public never had an opportunity to comment on that material as well, which is just a further reason why the agencies are precluded from relying on that material. Turning to the question about the choice of alternatives and the agency's obligation to explain why it picked one alternative over another, as you heard from respondents, the only reason offered in the record for rejecting the co-location alternatives at issue here was the purported lack of significant environmental benefits. Two things about that. The first is that insofar as the agencies concluded that there would be impacts to interior forests, they would be avoided by choosing these alternatives, but that these alternatives might increase other impacts. Key factors identified in the record are impacts to karst and increasing sideslope crossing. Weighing those alternatives requires a discussion of the extent of the types of impacts. You can't say the purely qualitative discussion of impacts to interior forests and impacts to karst, whether they're going to cancel each other out without saying how big of an impact they're going to be to interior forests and how big would the impact to, say, karst resources be from any one of these alternatives. And so the rule of reason requires analysis commensurate with the importance of the issue to the agency decision-making. And here where the agency's rejection of these alternatives was essentially predicated on the view that the benefits these alternatives would have to reducing interior forest impacts were not big enough to outweigh any drawbacks of these alternatives, you needed to say how big those impacts were before you could say they were not big enough. On the planning rule issue, I just wanted to point out that although the planning rule provisions that were added in the amendment are related, the only way that those amendments and provisions of 219.13 refer to whether an amendment is project-specific or not has to do with what you do once you determine that an amendment is directly related. Whether an amendment is project-specific or not doesn't come into play at the threshold inquiry of whether it is directly related to a substantive provision or not, which is a point we address in our reply brief. I appreciate your patience as I race through these quickly if there are any other questions about other material you'd like me to address. In closing, I just mentioned that for every one of the issues that we have raised, there's no dispute that we've identified gaps in the EIS where the EIS and the agency records of decision that came afterwards did not explicitly discuss the issue that we've identified here. All of the arguments that we've seen from respondents are saying, well, we sort of implicitly got at it this way, or this other material that may or may not have been cited in the EIS spoke to that concern. And those arguments about other material on the record and implicit consideration are inappropriate in a case like this where the issue is the NEPA obligation to inform the public and to demonstrate that the decision-makers themselves seriously grappled with the environmental impacts of what is, again, the largest pipeline to ever cross the Jefferson National Forest, or I believe any national forest. And the arguments about implicit consideration are especially inappropriate here where the impacts really speak to the core values protected by the National Forest, the core values protected by the Forest Plan. These are not fly specs about some sort of ancillary issue, which is tangential to the Forest Service's mission. These are impacts that speak to the core purposes served by the Jefferson National Forest. So I appreciate the time, Your Honor, and if there are no further questions. Thank you, Mr. Matthews. I'm going to ask the clerk to adjourn the court until tomorrow at 930. Then we'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, William B. Traxler Jr., Stephanie D. Thacker